# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3887

_____

United States of America,

          Appellee,

    v.

Kenneth Nolen,

          Appellant.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the Eastern
\*   District of Arkansas.
\*
\*
\*

_____

Submitted: June 9, 2008
Filed: August 4, 2008

_____

Before LOKEN, Chief Judge, EBEL,[1] and COLLOTON, Circuit Judges.

_____

EBEL, Circuit Judge.

Following a jury trial, Defendant-Appellant Kenneth Nolen was convicted on three counts: (I) conspiracy to possess crack cocaine and marijuana with the intent to distribute, (II) possession of crack cocaine with the intent to distribute, and (III) possession of marijuana with the intent to distribute. Nolen now appeals his

_____

[1] The Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation.

convictions, raising two arguments: (1) the district court[2] erred in denying his motion to suppress, and (2) the jury's verdict was not supported by sufficient evidence, and therefore the district court erred in denying his motion for acquittal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

Based on the testimony received at Nolen's trial, law enforcement's initial interest in Nolen was prompted by a call to the Akron, Ohio Police Department on January 31, 2006, by an individual named Carita Hale. To this end, Angela Lewis, a detective in the department, testified that she "received a phone call ... from a female stating that she was Carita Hale" and that Hale disclosed "very specific information on drug-related crimes starting in Arkansas and coming back to Akron...." A subsequent memorandum authored by Lewis summarized the information that Hale provided.

According to this memorandum, Hale alleged that Conici Clark would be flying from Cleveland, Ohio to Little Rock, Arkansas on January 31, 2006. Upon her arrival in Little Rock, Clark would be picked up in a red Ford Explorer by two males known only as "Calvin" (later identified as Calvin Blair) and "Kitney" (later identified as Nolen). Thereafter, Clark, with Blair and Nolen as her passengers, was to drive the Explorer back to Ohio. The Explorer would allegedly contain 10 kilos of cocaine, 3 bundles of ecstasy, and 20 pounds of marijuana. According to Hale, in exchange for driving the vehicle back to Ohio, Clark was to receive one pound of marijuana.

Because Hale had not previously served as an informant, Lewis took steps to confirm Hale's identity. In this regard, Lewis used Hale's "jail file" to confirm that

_____

[2] The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

the social security number provided by Hale in fact matched Hale's actual social security number. Additionally, Lewis questioned Hale, ostensibly using the information in Hale's "jail file," "[t]o make sure that she was who she said she was...." Satisfied that Hale "was who she said she was," Lewis began to corroborate the information that Hale provided.

First, Lewis, along with other officers, went to the Akron Greyhound bus station and confirmed Hale's assertion that at 3:25 p.m., Clark would be taking a bus from Akron to Cleveland. Subsequently, officers also confirmed Hale's claim that Clark would take a flight departing from Cleveland at 5:35 p.m., which after a layover, would arrive in Little Rock at 10:00 p.m. Because the information provided by Hale had so far proven accurate, Lewis's supervisor, Mike Caprez, relayed Hale's tips to Roger Case, a task force officer with the Little Rock district office of the Drug Enforcement Administration (DEA). Case took over the investigation from there.

Impressed with the specificity of the information relayed by Caprez, Case concocted an "operations plan," under which Clark would be placed under surveillance upon her arrival at the Little Rock airport. On account of this surveillance, officers observed that when Clark departed the airport, "she ... entered a vehicle almost exactly matching the description" of the vehicle that, according to Hale, "was supposed be picking her up." Thereafter, officers observed the vehicle, a red Ford Expedition (as opposed to an Explorer), travel in an erratic fashion, during which time it went at an extremely high rate of speed, made a number of circles around a residential block, stopped unexpectedly in odd places, and drove down a dead-end alley. After taking this roundabout route, the vehicle eventually arrived at the StudioPlus Hotel, where officers continued their surveillance.

While keeping watch at the hotel, officers observed the vehicle leave a number of times during the evening. Although officers attempted to watch the vehicle on these occasions, it continued to be driven in an erratic fashion, which made

surveillance difficult. Finally, "early in the morning hours," officers observed three individuals enter the vehicle – eventually identified as Clark, Blair, and Nolen – and depart from the hotel. After officers observed the vehicle travel for a long enough distance to satisfy themselves that it was on its way to Ohio, Officer Case requested that a member of the Arkansas State Police pull the vehicle over.

Trooper Trenton Behnke stopped the vehicle at 4:15 a.m. According to Behnke, he stopped the vehicle after following it for about a mile as it was going 90 miles per hour in a 65 miles per hour zone. Upon approaching the vehicle, Behnke learned that the vehicle's driver was Nolen and requested "his driver's license, registration, and insurance." Thereafter, the stop was taken over by the DEA and the Little Rock Police Department's narcotics division, which searched the vehicle.

Among the officers who assisted in the vehicle's search was Chris Littleton. According to Littleton, he searched underneath a "bench seat" where he "found a white pillowcase that contained an off-white, rock-like substance and also green vegetable matter." The "off-white, rock-like substance" was later identified to be 278.0 grams of crack cocaine, while the "green vegetable matter" was later identified to be 125.4 grams of marijuana. Both officers Case and Littleton testified that based on their experiences, each of these amounts exceeded what would normally be associated with personal use, and was instead consistent with distribution. Thereafter, each of the vehicle's three occupants – Clark, Nolen, and Blair – were taken into police custody and indicted on three counts: (I) conspiracy to possess crack cocaine and marijuana with the intent to distribute, (II) possession of crack cocaine with the intent to distribute, and (III) possession of marijuana with the intent to distribute.

Shortly after his arrest, Blair signed a statement that asserted the crack cocaine and marijuana found in the vehicle were his alone, and that he had placed the drugs in the vehicle without any assistance from Clark or Nolen. Blair later recanted this statement, however, and reached a plea agreement with the government. Pursuant to

this agreement, Blair testified on the government's behalf at Clark and Nolen's trial. According to Blair's trial testimony, Nolen and Clark were with him when he purchased the drugs and were responsible for placing the drugs in the vehicle. Blair asserted that "most of" the marijuana was for Clark. As for the crack cocaine, however, Blair somewhat ambiguously testified that although it was for him alone, he was going to sell it with Nolen's help, from which Nolen would profit.

Hale also testified on the government's behalf. According to Hale, the plan to acquire the drugs was initially hatched by Blair and Nolen, who eventually convinced Clark to be a part of the crime. For her part, Clark was to be the driver, because neither Blair nor Nolen had a driver's license. Hale also testified that "marijuana was the main drug that [she] heard discussed" in relation to the trio's plans. She was not sure, however, about the plan as it related to crack cocaine. Nor was Hale sure about the quantities of drugs that were being sought, only that "it was a large amount."

Clark took the stand in her own defense. According to Clark, she knew nothing about the drugs, and only went to Little Rock after the individual who was to drive Blair and Nolen back to Ohio decided to stay in Little Rock. Clark nevertheless recounted that while she was at the hotel with Nolen and Blair, she heard discussions concerning marijuana and surmised that the drug was in the hotel room, although she did not observe what quantity was possessed. According to Clark, she never observed any crack cocaine.

Following the close of testimony, Nolen moved for a judgment of acquittal; this motion was denied. Thereafter, the case went to the jury, which found Nolen guilty of each of the charges against him. Clark, meanwhile, was found guilty in relation to the marijuana charges, but not guilty in relation to the crack cocaine charges. Nolen now appeals.

## II. DISCUSSION

On appeal, Nolen has raised two central arguments: (1) the district court erred in denying his motion to suppress, and (2) the jury's verdict was not supported by sufficient evidence, and therefore the district court erred in denying his motion for acquittal. We consider each argument in turn.

### A. Motion to Suppress

On the day before his trial, Nolen moved to suppress the drugs that were discovered during the officers' warrantless search of the Ford Expedition. Specifically, Nolen argued that the warrantless search was not supported by probable cause, and therefore violated his Fourth Amendment rights. After the trial began and the district court had an opportunity to hear testimony from a number of government witnesses, the court denied Nolen's motion. According to the court, based on the information provided by Hale, as well as the erratic driving of the Ford Expedition, the officers' search was supported by probable cause. We agree.

### 1. Standard of Review

"We review the district court's factual findings in support of its denial of a motion to suppress for clear error and its legal determination of probable cause de novo." United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005). We must affirm the district court's denial of the motion "unless it is not supported by substantial evidence on the record; it reflects an erroneous view of the applicable law; or upon review of the entire record, [we are] left with the definite and firm conviction that a mistake has been made." United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007) (alteration in original) (internal quotation omitted) (quoting United States v. Janis, 387 F.3d 682, 686 (8th Cir.2004)).

## 2. Probable Cause

"The warrantless search of a vehicle is constitutional pursuant to the 'automobile exception' ... if law enforcement ha[s] probable cause to believe the vehicle contain[s] contraband or other evidence of a crime before the search beg[ins]." United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000). In this case, the government argues that probable cause was established in large part based on the information provided by Hale. We agree.

As the Supreme Court observed in Illinois v. Gates, 462 U.S. 213, 232 (1983), "[i]nformants' tips doubtless come in many shapes and sizes from many different types of persons" and "may vary greatly in their value and reliability." (Quotation omitted). As such, "[o]ne simple rule will not cover every situation." Id. (quotation omitted). Instead, when determining whether an informant's tip supports a finding of probable cause, the Supreme Court has directed courts to engage in "a totality-of-the-circumstances analysis, which permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip...." Id. at 234.

In undertaking this analysis, the Supreme Court has recognized a distinction between "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated," Florida v. J.L., 529 U.S. 266, 270 (2000), and an anonymous informant, who cannot so easily be held responsible. See also United States v. Kent, ___ F.3d ___, 2008 WL 2631441, *3 (8th Cir. July 7, 2008) (asserting that a known informant "could be held accountable by [a] detective for [providing] false information"). This distinction is important, because although a tip received from a known informant will more readily support a finding of probable

cause, a tip received from an anonymous informant requires "[s]omething more," usually in  terms of independent police corroboration, before probable cause may arise.  Gates, 462 U.S. at 227, 241.

In addition to there being a distinction between known informants and anonymous informants, there is also an important distinction between the two types of known informants: reliable informants and unproven informants.  Reliable informants are individuals who have "a track record of supplying reliable information" to law enforcement officers.  United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993).  Information supplied by such parties may be "sufficiently reliable to support a probable cause finding." Id.  See also United States v. Lucca, 377 F.3d 927, 933 (8th Cir. 2004) (asserting "[t]he information from a [confidential reliable informant] is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information.").  Unproven informants are individuals without a track record of supplying information to law enforcement officers.  "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information."  Kent, 2008 WL 2631441, at *3. Nevertheless, information supplied by such individuals "requires some independent verification to establish reliability." Id. (citing United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995)).  "Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." Brown, 49 F.3d at 1349.

In this case, it is clear that Hale cannot be classified as a reliable informant.  It is less clear, however, whether Hale should be classified as an unproven informant or anonymous informant.  On the one hand, Hale identified herself to Detective Lewis, independently confirmed her social security number, and left Lewis convinced that she "was who she said she was." On the other hand, there is no indication in the record that Lewis ever had a face-to-face interaction with Hale during which time she could

have confirmed Hale's identity. Accordingly, there remained at least a possibility that Hale was concealing her true identity. On balance, however, we conclude that Hale should be regarded as an identified, but unproven informant. She identified herself by name, gave her social security number that matched her name, and apparently provided either additional information or spoke with a demeanor that enabled Detective Lewis, an experienced officer, to conclude she "was who she said she was."[3] Thus, her statement is entitled to some credibility based on the fact that she could be held accountable if she made a false statement to a police officer. Accordingly, the further corroboration needed to elevate her accusations to probable cause is lessened.

Similar circumstances were encountered in Massachusetts v. Upton, 466 U.S. 727 (1984). There, an officer asserted that a would-be anonymous informant admitted to him on the telephone that she was in fact the individual he suggested she was. It appears the officer never met the caller in person, however, and the Court conceded that the caller's admission could have been "a convenient cover for [the informant's] true identity." Id. at 734. However, "given the caller's admission" as well as other pertinent knowledge exhibited by the caller, the Court concluded that the officer's inference regarding the caller's identity "was a reasonable one and conformed with the other pieces of evidence making up the total showing of probable cause." Id. Thus, "[a]lthough personal contact with an informant can strengthen an officer's decision to rely on the information provided, it is not invariably required." United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996) (citations omitted). Instead, it is one of the many factors that must be considered in assessing the totality of the circumstances.

---

[3]  In reaching this conclusion, it appears that Detective Lewis relied in part on information that was contained in Hale's "jail file." Unfortunately, aside from the existence of such a file, no further information about it or its contents was adduced at trial or supplied in the record.

In this case, Hale provided a variety of specific, detailed information that was independently corroborated by officers and proved to be accurate. This information included an accurate description of Clark's travel plans from Akron to Little Rock – right down to the precise bus and flight that Clark would use in her travels, a reasonably accurate description of the type of vehicle that would pick-up Clark at the airport, and an accurate description of the brief stay the group would have in Little Rock. This information, as corroborated, is sufficient to establish probable cause under the circumstances presented in this case. Hale's information "contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." Gates, 462 U.S. at 245.

> Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop.

Alabama v. White, 496 U.S. 325, 332 (1990) (citation omitted).

Furthermore, in addition to Hale's tips, officers also independently observed suspicious conduct once Clark reached Little Rock. These observations included Nolen's erratic driving after picking-up Clark from the airport, as well as the trio's quick departure from Little Rock in the early morning hours, less than six hours after Clark's arrival. When these observations are coupled with the information provided by Hale, it is clear that "given the totality of the circumstances, a reasonable person could believe there [was] a fair probability that contraband or evidence of a crime would be found in a particular place." Fladten, 230 F.3d at 1085. Accordingly, we

conclude that the officers had probable cause to search the vehicle, and that therefore the district court did not err in denying Nolen's motion to suppress.

## B. Judgment of Acquittal

Nolen argues that there was insufficient evidence to support the jury's verdict and that the district court therefore erred in denying his motion for judgment of acquittal. In making this argument, Nolen asserts that the government failed to produce sufficient evidence with respect to the marijuana charges, and that the jury made internally inconsistent findings with respect to the crack cocaine charges faced by both Nolen and Clark. We disagree.

### 1. Standard of Review

"We review de novo a district court's denial of a motion for judgment of acquittal." United States v. McAtee, 481 F.3d 1099, 1104 (8th Cir. 2007). "We view the evidence in the light most favorable to the jury's verdict and we draw all reasonable inferences in the government's favor...." Id. "[W]e will uphold the verdict if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." United States v. Cole, 525 F.3d 656, 661 (8th Cir. 2008) (quotation omitted). "Both direct and circumstantial evidence can be the basis of a conviction." United States v. Beckman, 222 F.3d 512, 522 (8th Cir. 2000). "The standard of review is 'very strict,' and we will reverse a conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt." United States v. Beck, 496 F.3d 876, 879 (8th Cir. 2007) (citation omitted). Moreover, in making this determination, we may not "weigh the evidence or assess the credibility of witnesses." United States v. Santana, 524 F.3d 851, 853 (8th Cir. 2008).

## 2. The Marijuana Convictions

With respect to the marijuana that was found in the vehicle, Nolen was convicted of (1) conspiracy to possess marijuana with the intent to distribute, and (2) possession of marijuana with the intent to distribute. Nolen asserts that the jury lacked sufficient evidence to convict him of either of these charges. In making this argument, Nolen relies primarily on his belief that Blair testified the marijuana found in the vehicle was for Clark alone.

"To establish that a defendant conspired to distribute drugs ..., the government must prove: (1) that there was a conspiracy, i.e., an agreement to distribute the drugs; (2) that the defendant knew of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." United States v. Rolon-Ramos, 502 F.3d 750, 754 (8th Cir. 2007) (quotation omitted).

> Direct evidence of an explicit agreement is not necessary to prove a conspiracy; instead, a tacit understanding among co-conspirators may be, and often will be, inferred from circumstantial evidence. In many conspiracy cases there is no confession by the defendant or other direct proof that he agreed to the illegal act. However, the jury is free to consider all the evidence–direct and indirect–presented of the defendant's statements and actions. In addition, the jury may draw reasonable inferences from the evidence presented about what the defendant's state of mind was when he did or said the things presented in the evidence.

United States v. Winston, 456 F.3d 861, 866 (8th Cir. 2006) (quotations, citation omitted). Notably, "[a] defendant challenging the sufficiency of the evidence in a conspiracy case has a heavy burden." United States v. Mickelson, 378 F.3d 810, 821 (8th Cir. 2004).

Based on our review of the trial testimony, viewed in the light most favorable to the jury's verdict, we conclude that there was sufficient evidence for the jury to have convicted Nolen of conspiracy to possess marijuana with the intent to distribute. Of course, the first issue that must be considered with respect to this inquiry is whether a conspiracy did indeed exist. Although no evidence was offered of any explicit agreement, we conclude that circumstantial evidence allowed the jury to make this determination.

Nolen is mistaken in his claim that Blair wholly testified the marijuana was for Clark alone. Although Blair testified that the marijuana was "gonna go to" Clark, he also indicated that only "most of it" was for her. Based on this testimony, a reasonable juror could have concluded that the remainder of the marijuana was going to Blair and Nolen for distribution purposes, especially in light of Blair's testimony regarding the crack cocaine. This notion is lent further support by other testimony that was adduced at trial. For instance, Hale testified that "marijuana was the main drug that [she] heard discussed" in relation to the group's plans and that the goal was to obtain "a large amount" of the drug. Moreover, Clark recounted that when she was in the Little Rock hotel with Blair and Nolen, she heard discussions concerning marijuana, and surmised that it was in the hotel room. Taken as a whole, and viewed in the light most favorable to the jury's verdict, a reasonable juror could have concluded that this evidence established the existence of a conspiracy to distribute marijuana.

Having concluded that sufficient evidence supported the jury's determination that there was in fact a conspiracy, we must next determine whether Nolen knew of the conspiracy and whether he intentionally joined it. Much of the evidence cited in establishing the existence of a conspiracy also supports the jury's conclusion on each of these issues. An additional key piece of evidence, however, comes in the form of Blair's testimony that Nolen was with him when he purchased the drugs and that Nolen, along with Clark, was responsible for placing the drugs in the vehicle. It is

clear that viewing this testimony in the light most favorable to the jury's verdict, sufficient evidence existed by which the jury could conclude that Nolen both knew of and intentionally joined the conspiracy. Accordingly, the district court did not err in denying Nolen's motion for judgment of acquittal on this charge.

Nolen also asserts that his conviction for possession of marijuana with the intent to distribute was not supported by sufficient evidence. We disagree. To establish that Nolen possessed marijuana with the intent to distribute, the government had to prove beyond a reasonable doubt that Nolen (1) knowingly possessed and (2) intended to distribute the marijuana found in the vehicle. United States v. Boyd, 180 F.3d 967, 979 (8th Cir. 1999). In this case, knowing possession was established by Blair's testimony that Nolen, along with Clark, placed the drugs in the vehicle, of which Nolen was eventually discovered to be the driver. Meanwhile, intent to distribute was established by the testimony of both officers Case and Littleton, who each asserted that based on their experiences, the amount of marijuana discovered in the vehicle exceeded that which would normally be associated with personal use, and instead was consistent with distribution purposes. Based on the foregoing, we conclude that Nolen's conviction for possession of marijuana with the intent to distribute was supported by sufficient evidence, and that therefore the district court did not err in denying Nolen's motion for judgment of acquittal on this charge.

### 3. The Crack Cocaine Convictions

With respect to the crack cocaine that was found in the vehicle, Nolen was convicted of (1) conspiracy to possess crack cocaine with the intent to distribute, and (2) possession of crack cocaine with the intent to distribute. Nolen asserts that the jury lacked sufficient evidence to convict him of either of these charges. In making this argument, Nolen principally relies on the notion that because the jury found Clark

not guilty of the same crack cocaine charges, it must have determined that Blair was not a credible witness. And in the absence of Blair's testimony, Nolen asserts, there was no evidence tying him to the crack cocaine.

Nolen's argument is unavailing. "[C]redibility findings are well-nigh unreviewable, so long as the findings are not internally inconsistent...." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001). And in this case, Blair's testimony in relation to the crack cocaine widely differed with respect to Clark and Nolen, thereby extinguishing any possible internal inconsistencies in the jury's findings. In this regard, Blair tied Clark to the crack cocaine only by way of his testimony that she was present when it was purchased and that she helped Nolen place it in the vehicle. With respect to Nolen, however, Blair further asserted that Nolen was to help him distribute the crack cocaine and that Nolen was going to profit from this distribution. As such, given the considerable differences in the testimony with respect to Clark and Nolen vis-a-vis the crack cocaine, there is no basis on which to conclude the jury's findings were somehow internally inconsistent, and we therefore reject Nolen's argument.

Furthermore, even if the jury's verdicts were inconsistent, "[i]nconsistency in a verdict is not a sufficient reason for setting it aside." Harris v. Rivera, 454 U.S. 339, 345 (1981). The Supreme Court has

> so held with respect to inconsistency between verdicts on separate charges against one defendant, Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L.Ed. 356 (1932), and also with respect to verdicts that

treat codefendants in a joint trial inconsistently, <u>United States v. Dotterweich</u>, 320 U.S. 277, 279, 64 S. Ct. 134, 135, 88 L.Ed. 48 (1943).

<u>Id.</u> (footnote omitted).

### III.  CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

_____